No. 25-1314

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

CRYSTAL CZERNO, individually and
as parent and natural guardian of C.L., a
minor, *Plaintiff-Appellee*,

v.

GENERAL ELECTRIC COMPANY
*Defendant-Appellant*,

GE PLASTICS, a/k/a PLASTICS TECHNOLOGIES, INC.,
*Defendant-Appellee*,

MONSANTO COMPANY; SOLUTIA, INC.; PHARMACIA LLC; BAYER,
AG' SABIC INNOVATIVE PLASTICS GLOBAL TECHNOLOGIES LP;
SABIC INNOVATIVE PLASTICS TECHNOLOGIES, INC.; SABIC
INNOVATIVE PLASTICS US LLC; SAUDI BASIC INDUSTRIES CORP.
(SABIC),
*Defendants.*

On Appeal from an Order of Remand of the
United States District Court for the District of Massachusetts
Case No. 3:23-cv-30099 (Mastroianni, J.)

## APPELLEE'S BRIEF

John B. Stewart (CA1 Bar # 8817)
JOHN B. STEWART, P.C.
93 Van Deene Ave., Ste. 103
West Springfield, MA 01089
Ph. (413) 206-9134
*Counsel of Record for Plaintiff-Appellee*
*Crystal Czerno, Ind'lly and p/p/a for*
*C.L, a Minor*

Thomas E. Bosworth
BOSWORTH DEANGELO, LLC
123 S. Broad St., Ste. 1620
Philadelphia, PA 19109
Ph. (267) 928-4183
*Counsel for Appellee*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... iii

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ......................... vii

INTRODUCTION ................................................................................1

STATEMENT OF THE ISSUES .............................................................6

STATEMENT OF THE CASE.................................................................7

SUMMARY OF ARGUMENT................................................................15

ARGUMENT ....................................................................................17

    A.   Legal Standard on Removal and Remand................................19

    B.   The Federal-Officer Removal Statute ......................................19

    C.   Courts Have Repeatedly Held That Federal-Officer Removal Is Improper in Toxic Pollution Cases Including PCB Exposure Cases ...............................20

    D.   GE Has Failed to Establish Subject-Matter Jurisdiction Under the Federal-Officer Removal Statute...................................................................24

    E.   The Complaint's Reference to "Remediation" Does Not Confer Jurisdiction Under 28 U.S.C. § 1442 ............................................................42

    F.   GE Has No Colorable Federal Defense ...................................47

CONCLUSION .................................................................................51

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ....................................52

CERTIFICATE OF SERVICE ................................................................53

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Hackett,*
  646 F. Supp. 2d 1041 (S.D. Ill. 2009) ........................................... 23, 24, 25, 28, 31

*Arness v. Boeing N. Am, Inc.,*
  997 F. Supp. 1268 (C.D. Cal. 1998) ......................................................... 22, 37, 38

*Badgerow v. Walters,* 596 U.S. 1 (2022) ................................................................19

*Bahrs v. Hughes Aircraft Co.,*
  795 F. Supp. 965 (D. Ariz. 2010) ........................................................... 22, 37, 38

*Boyle v. United Tech. Corp.,*
  487 U.S. 500 (1988) ............................................................................................48

*Chappell v. SCA Services, Inc.,* 540 F. Supp. 1087 (C.D. Ill. 1982) .......................50

*Church v. General Electric Co.,*
  138 F. Supp. 2d 169 (D. Mass. 2001) ..................................................................10

*City of Brunswick v. Honeywell Internat'l, Inc.,*
  22-cv-00132, 2023 WL 5671290 (S.D. Ga. Sept. 1, 2023) 4, 24, 27, 42, 44, 45, 46,
  47

*City of Seattle v. Monsanto Co.,*
  387 F. Supp. 3d 1141 (W.D. Wa. 2019) ................................................................18

*Clayton v. Cerro Flow Prods.,*
  *Inc.,* Civil No. 09-550-GPM, 2010 WL 55675 (S.D. Ill. Jan. 4, 2010) .... 23, 24, 25,
  28, 31

*Coffey v. Freeport-McMoRan Copper & Gold Inc.*,
 623 F. Supp. 2d 1257 (W.D. Okla. 2009)..................................................... 22, 37, 38

*Custer v. Cerro Flow Prods., Inc.*,
 No. 09–514–DRH, 2009 WL 5033931 (S.D. Ill. Dec. 15, 2009) . 23, 24, 25, 28, 31, 49

*Kelly v. Monsanto Co.*,
 2016 WL 3543050 (E.D. Mo. June 29, 2016)................................ 23, 24, 25, 28, 31

*Kontrick v. Ryan*,
 540 U.S. 443 (2004) .................................................................................................19

*Maryland v. 3M Company*,
 130 F.4th 380 (4th Cir. 2025) ........................................................................ 41, 42

*Mobley v. Cerro Flow Prods.*,
 Civil No. 09-697-GPM, 2010 WL 55906 (S.D. Ill. Jan. 5, 2010) . 23, 24, 25, 28, 31

*Moore v. Electric Boat Corp.*,
 25 F.4th 30 (1st Cir. 2022) ......................................................... 4, 20, 39, 40, 47, 48

*Morrison v. Nat'l Australia Bank Ltd.*,
 561 U.S. 247 (2010) .................................................................................................19

*New Jersey DEP v. Exxon Mobil Corp.*,
 381 F. Supp. 2d 398 (D.N.J. 2005) .......................................................... 22, 37, 38

*New Mexico v. Monsanto Co.*,
 454 F. Supp. 3d 1132 (D.N.M. 2020)................................. 20, 23, 24, 25, 28, 31, 49

*Rhode Island v. Shell Oil Prods. Co.*,
 35 F.4th 44 (1st Cir. 2022) .................................................................. 21, 26, 36, 38

*Rucker v. Monsanto Co.*,
  Case No. 23–CV–00868–SPM, 2023 WL 3494716 (S.D. Ill. May 17, 2023) .......21

*San Diego Unified Port Dist. v. Monsanto Co.*,
  445 F. Supp. 3d 1098 (S.D. Cal. 2020) ...................................................................18

*Sarocco v. General Elec. Co.*,
  879 F. Supp. 156 (D. Mass. 1995) .........................................................................14

*State of Washington v. Monsanto Co.*,
  274 F. Supp. 3d 1125 (W.D. Wa. 2017) .................................. 18, 22, 24, 25, 28, 31

*Stewart v. Rheem Manufacturing Co.*,
  926 So. 2d 90 (La. Ct. App. 2006).........................................................................49

*Watson v. Philip Morris Co.*,
  551 U.S. 142 (2007)............................................................. 3, 16, 20, 24, 27, 34, 42

*West Va. v. Dow Chemical Co.*,
  23 F.4th 288 (4th Cir. 2022)........................................... 4, 24, 27, 42, 43, 44, 46, 47

**Statutes**

15 U.S.C § 2619(c)(3)......................................................................................... 50, 51

15 U.S.C. § 2619..................................................................................................50

28 U.S.C § 1442(a) ........................................................................... 34, 38, 47, 48

28 U.S.C. § 1332(a)(1).........................................................................................10

28 U.S.C. § 1441(c) .............................................................................................19

28 U.S.C. § 1442............................. v, 1, 3, 4, 5, 6, 15, 16, 18, 28, 31, 41, 43, 45, 51

28 U.S.C. § 1442(a)(1)........................ 17, 18, 19, 20, 21, 25, 27, 28, 30, 32, 38, 42

28 U.S.C. § 1447(c) .............................................................................................19

42 U.S.C § 9613(j)(2) ..................................................................30

42 U.S.C. § 9601 .......................................................................29

42 U.S.C. § 9607 .......................................................................29

42 U.S.C. § 9613(j) ...................................................................29

42 U.S.C. § 9613(j)(1) ......................................................... 29, 30

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Oral argument should be heard because that will allow counsel to summarize and streamline this appeal which should be summarily affirmed. The issue presented in this case is a simple one that has been addressed consistently by federal courts across the country. Those courts, like the district court below, have found there is no federal subject-matter jurisdiction under 28 U.S.C. § 1442 in similar toxic-tort cases. The arguments raised by appellant-defendant are not novel, and have been uniformly rejected in these other toxic-tort cases. Oral argument will also help make clear that the district court below ruled that appellant-defendant failed to demonstrate the first (of three) required elements to establish subject-matter jurisdiction under 28 U.S.C. § 1442, and, thus, did not address the second or third elements; this Court should do the same.

## INTRODUCTION

This case is about the improper disposal, pollution, and dumping of toxic chemicals, polychlorinated biphenyls ("PCBs"), by defendant-appellee, General Electric Co. ("GE"), in Pittsfield, Massachusetts. Plaintiff's minor child, C.L., was exposed to PCBs at his school—one of GE's old dumping grounds—and, as a result, C.L. contracted leukemia. The federal government never ordered, endorsed, required, condoned, or oversaw GE's disposal, pollution, or dumping of PCBs. Plaintiffs filed suit in Massachusetts state court in 2023, asserting various state-law tort claims against GE arising out of GE's negligent disposal, pollution, and dumping of PCBs.

After plaintiff filed suit in state court, GE filed a notice of removal to federal court, asserting federal jurisdiction pursuant to the "federal-officer" removal statute, 28 U.S.C. § 1442. Plaintiff then filed a motion to remand, arguing GE had failed to establish necessary elements to invoke jurisdiction under 28 U.S.C. § 1442: (1) that GE was "acting under a federal officer's authority"; (2) that GE's charged conduct was "for or relating to" the asserted official authority; and (3) that GE could assert a colorable federal defense to the suit. After extensive briefing and oral argument, the district court granted plaintiff's motion to remand to state court.

GE's jurisdictional argument under § 1442 is a recycled one that has been consistently rejected by federal courts across this country in similar toxic-tort

pollution cases, including PCB cases. As in those cases, here, Plaintiff's claims against GE are premised upon GE's negligent disposal and dumping of PCBs. Plaintiff's claims have nothing to do with the general fact that GE used PCBs in their manufacturing process of certain machines (transformers) during World War II.

GE, like many private-company polluters before it, asserted a "war time efforts" argument in the district court below. It did not work. In rejecting this argument, the district court cited a string of federal cases that have rejected this identical jurisdictional argument in analogous cases, including PCB cases. As the district court aptly concluded, plaintiff's claims necessarily depend upon GE's negligent *disposal* of the PCBs and not GE's mere use of PCBs: "As Plaintiff argues, 'GE's negligent disposal and dumping of PCBs throughout Pittsfield is a necessary ingredient of plaintiff's claims against GE. . . . [I]f GE merely used PCBs in making equipment but then safely and properly disposed of the PCB waste after use, there would be no PCB exposure and thus there would be no claim.'" Add7.

Against this backdrop, the district court correctly ruled that GE could not meet the first required element of the federal-officer removal statute: that GE was "acting under" a federal officer's authority. GE was not "acting under" the federal government's authority when GE negligently disposed, dumped, and discarded PCBs throughout the community. If GE never disposed, dumped, and discarded

PCBs throughout the community, minor-plaintiff, C.L., would never have contracted leukemia from PCB exposure. Plain and simple.

GE's secondary jurisdictional argument rests upon a Consent Decree that GE entered into with the Environmental Protection Agency (EPA) in 2000. After surveying case law, the district court aptly concluded that "courts have held that analogous EPA-ordered remedial measures do not transform a private polluter into a de facto government agent for removal purposes." Add7. As relied upon by the district court, the U.S. Supreme Court has long held that, for purposes of a jurisdictional analysis under 28 U.S.C. § 1442, a private actor's "compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.'" *Watson v. Philip Morris Co.*, 551 U.S. 142, 153 (2007). This is so "even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored." *Id.* As such, mere compliance with an EPA decree does not amount to "acting under" the federal government.

Notably, and as determined by the district court, the 2000 Consent Decree was entered into *after* GE's negligent pollution conduct. Neither the EPA, nor any branch of the federal government, ever endorsed, condoned, required, or even knew about GE's improper pollution conduct when the conduct was occurring. Therefore, as the district court ruled, the 2000 Consent Decree does not—and cannot—demonstrate

that GE was "acting under" the authority of the federal government when GE engaged in negligent pollution conduct that occurred and concluded years prior to the formation of the EPA Consent Decree in 2000.

GE bore the burden to establish three required elements necessary to invoke federal jurisdiction under 28 U.S.C. § 1442: (1) that it was "acting under a federal officer's authority"; (2) that the charged conduct was carried out "for or relating to" the asserted official authority; and (3) it will assert a colorable federal defense. *Moore v. Electric Boat Corp.*, 25 F.4th 30, 34 (1st Cir. 2022). The district court correctly ruled that GE could not establish the first element—that GE was "acting under" a federal officer's authority. Therefore, the district court did not reach the second or third element, and neither should this Court.

Recognizing the futility of its argument under 28 U.S.C. § 1442, GE tried to recast its argument in its appellate brief to microscopically hinge upon the words "remediate" or "remediation" in plaintiff's 96-page complaint. According to GE, these references to "remediation" confer jurisdiction under 28 U.S.C. § 1442. But GE is wrong, offers no precedent for its position, and this exact argument has been rejected by federal courts time and again. *See, e.g.*, *West Va. v. Dow Chemical Co.*, 23 F.4th 288, 293–97, 304–305 (4th Cir. 2022); Appx1563-1566, 1576 ¶¶ 31, 35(a), 35(d), 35(e), 35(f), 42, 43, 105; *City of Brunswick v. Honeywell Internat'l, Inc.*, 22-cv-00132, 2023 WL 5671290, at *2–3 (S.D. Ga. Sept. 1, 2023).

As federal courts have consistently done throughout this country, in similar toxic-tort pollution cases, this Court should affirm the district court's decision to remand this action to state court. GE did not, and cannot, demonstrate that GE was "acting under" the authority of the federal government when GE negligently polluted the Pittsfield community with PCBs. Affirming that ruling, this Court need not pass upon the second or third elements of the federal-officer removal statute.

However, if this Court were to reverse the district court's ruling—that GE was not "acting under" a federal officer's authority when it polluted Pittsfield with PCBs—GE's appeal still fails because GE cannot show that GE's charged conduct was "for or relating to" an official federal authority. Plaintiff's complaint does not assert any claim based solely on the fact that GE used PCBs in its manufacturing processes. Absent GE's unlawful conduct in disposing, polluting, and dumping PCBs, there is no claim against GE because, absent this conduct, minor-plaintiff, C.L., would never have been exposed to PCBs. Thus, GE cannot establish the second element necessary for jurisdiction under 28 U.S.C. § 1442.

Finally, assuming this Court were to pass upon the first two elements GE was required to prove under 28 U.S.C. § 1442, and finding both in GE's favor, the district court's remand order should still be affirmed because GE has no colorable federal defense. As outlined *infra*, GE's federal-contract defense is one reserved only in cases involving design defects in military equipment. This case does not involve any

design defects in military equipment, and this exact federal-contractor defense has previously been rejected before by federal courts in PCB pollution cases. Lastly, GE has no defense under the Toxic Substances Control Act (TSCA), since, as multiple courts have held, the TSCA does not preempt state-law tort claims related to PCB-exposure injuries.

## STATEMENT OF THE ISSUES

1.  Should this Court affirm the district court's ruling that GE failed to establish federal jurisdiction under 28 U.S.C. § 1442 because GE was not "acting under" the authority of the federal government when GE improperly disposed of, dumped, and polluted Pittsfield with PCBs?

*Suggested Answer*: **Yes.**

2.   Assuming *arguendo* this Court reverses the district court's finding on the "acting under" element of 28 U.S.C. § 1442, should this Court still affirm the district court's remand ruling because GE did not and cannot demonstrate that GE's charged conduct in this case was carried out "for or relating to" any asserted official authority?

*Suggested Answer*: **Yes.**

3.  Assuming *arguendo* this Court reverses the district court's finding on the "acting under" element of  28 U.S.C. § 1442 and goes on to find that GE's charged conduct in this case was carried out "for or relating to" asserted official

authority, should this Court still affirm the district court's remand order because GE has no colorable federal defense?

**_Suggested Answer_:**     **Yes.**

## STATEMENT OF THE CASE

Beginning in the early 1900s, defendant, General Electric ("GE"), began operating a large-scale industrial facility in Pittsfield, Massachusetts, where GE "used numerous industrial chemicals" including poly-chlorinated biphenyls ("PCBs"). Appx1419-1424. For forty-five (45) years, from 1932 through 1977, defendant GE manufactured and serviced electric transformers containing PCBs. _Id._ Consistently throughout these 45 years, defendant GE improperly and negligently disposed of, polluted, and discarded PCBs throughout Pittsfield, including by dumping hundreds of thousands of pounds of PCBs into the nearby Housatonic River. Appx1425-1433. At no point throughout these 45 years did the federal government (or any federal official) require, mandate, endorse, oversee, or supervise GE's negligent disposal, pollution, dumping, and discarding of PCBs throughout Pittsfield.

Allendale Elementary School borders GE's property in Pittsfield. Hill 78, which abuts this school, is a toxic landfill that GE has used for decades to improperly dump, discard, dispose of, and store PCBs and other toxic waste. GE began using Hill 78 as a toxic disposal area long before the federal government or EPA ever had

any involvement with (or even knew about) Hill 78. As explained in a 1991 report prepared for GE: "The Hill 78 landfill has been used by GE since the early 1940s for the disposal of excavated soils, plant demolition and construction debris, and other solid wastes." Appx1435, 1441.

In the "mid-to-late 1970s to 1990," excavated soil from the GE facility and non-degradable construction debris containing PCBs "were disposed of at the [Hill 78] landfill." Appx1454. GE continued to use Hill 78 as a PCB dumping ground from the 1970s through 1990. Appx1456. This improper disposal of PCBs in the Hill 78 landfill that occurred throughout this time period was not mandated, supervised, or overseen by the federal government. It was GE's decision—and GE's decision alone—to engage in this negligent disposal of PCBs in Hill 78. Nobody, including the federal government, made GE use Hill 78 as a dumping ground for PCBs. The federal government never mandated, required, endorsed, or even knew that GE was using Hill 78 as a dumping ground during this time.

In 1950, GE provided PCB-drenched soil to the City of Pittsfield to be used to layer the property of Allendale Elementary School as the school was being built. Appx1509-1515, 1517; Appx1520 ("In 1950, during the construction phase of the school, PCB contaminated fill from the G.E. facility was used to level the terrain"). The federal government had absolutely no involvement in this abhorrent conduct, and certainly did not require GE to provide PCB-laden soil to be used in building an

elementary school. The PCB-laden fill material that GE provided to Pittsfield to use in building this school was taken directly from Hill 78. Appx1510-1511 ("The fill material placed on the school property originated from the Hill 78 Area").

In 1990, a local state agency—the Massachusetts Department of Environmental Protection ("MA DEP")—conducted soil sampling at Allendale School "and detected PCBs." *Id.* The MA DEP then requested that GE conduct additional soil sampling at the school, which GE did in 1991. Appx1511. "In 1991, in response to the MA DEP and GE soil sampling results, GE conducted an evaluation of various potential remedial options for the Allendale School property, and MA DEP selected a capping option as a Short-Term Measure for the property." *Id.* This capping of Hill 78 that was done by GE in the early 1990s was completed at the request of the state (not federal) government. *Id.*

It was not until 2000—*nearly 70 years after* GE first began improperly disposing, discarding, and releasing PCBs in and around Pittsfield—that the EPA entered into a consent decree with GE regarding remediation of GE's PCB pollution of Pittsfield. *See id.* (noting that the EPA consent decree "became effective in October 2000" under the section of the webpage titled "When did EPA get involved?"). Prior to 2000, the federal government never mandated, oversaw, or supervised GE's negligent and improper disposal, discarding, storage, or release of PCBs. By 2000, of course, the damage was already done. *See* Appx1427 (noting that

PCBs are "persistent in the environment and resistant to biodegradation" resulting in them remaining in the environment for "hundreds of years" after initial pollution).[1]

Plaintiff, Crystal Czerno, is the mother of C.L., a minor. Appx467 ¶¶ 2–3. Plaintiff commenced this action by filing a complaint in Massachusetts state court (Berkshire County). There is no diversity-of-citizenship jurisdiction in this case because Ms. Czerno and C.L. are both citizens of Massachusetts and so are several defendants, including GE. Appx467-468 ¶¶ 2–3, 6–10; 28 U.S.C. § 1332(a)(1). Plaintiff's complaint brings only state-law tort claims (no federal claims) against the defendants. Plaintiff's complaint does not plead any federal claim or cause of action.

Per the express language of the complaint, Plaintiff's action "arises out of the decades-long decimation and destruction of the health and wellbeing of the residents of Berkshire County caused by the Corporate Defendants' intentional, repeated, and blatant pollution, dumping, use, and disposal of toxic and cancerous chemicals

---

[1] The U.S. District Court for the District of Massachusetts' 2011 opinion in *Church v. General Electric Co.*, 138 F. Supp. 2d 169 (D. Mass. 2001) provides an excellent historical overview of GE's history of improper disposal and pollution of Pittsfield with PCBs—conduct which long preceded any federal government involvement. As outlined by Judge Ponsor, "years of waste disposal practices by GE had contaminated the company's site with PCBs." *Church*, 138 F. Supp. 2d at 172. "Through at least the 1960s, General Electric dumped waste oil containing PCBs into the land around its plant and into the Housatonic River." *Id.* As the district court pointed out, it was not until October 2000 that any consent decree was entered between GE and the EPA. *Id.* at 173.

known as [PCBs]." Appx466 ¶ 1. Plaintiff's complaint specifically alleges that, for decades, GE has treated the Pittsfield "community as their dumping ground, going so far as to allow the dissemination and dumping of PCB-drenched soil in children's playgrounds and schoolyards." *Id.* Plaintiff's son, C.L., was a student at Allendale Elementary for years. As a result of GE's negligent disposal and discarding of PCBs at Allendale School and Hill 78, the complaint alleges, C.L. developed leukemia, has nearly died, and has undergone numerous rounds of chemotherapy, radiation, and bone marrow biopsies. *Id.*

The EPA has opined that it was GE's "improper disposal" methods that "led to extensive contamination around Pittsfield, MA as well as down the entire length of the Housatonic River." Appx496 ¶ 157; Appx1419-1424. GE's PCB pollution activities were so severe that, by 1977, GE had rendered the Housatonic River unfishable. Appx496 ¶ 160. As plaintiff's complaint alleges, "GE purchased an estimated 190 million pounds of PCBs over a period of multiple decades" to use in electric transformers, despite the fact that there were feasible safer alternatives to PCBs, including silicon. Appx496 ¶ 163.

GE's own internal documents recognize their wrongdoing, none of which was mandated, condoned, or supervised by the federal government. In one GE memorandum from 1970, GE employee, Kenneth R. Murphy, acknowledged GE had been dumping PCBs directly into "bodies of water" and disposing of PCBs "in an

'out of sight, out of mind' manner." Appx497 ¶ 167. Due to GE's negligent pollution and disposal of PCBs, young children, in particular, are susceptible to the health hazards of this PCB exposure. Appx498 ¶ 178.

Plaintiff's complaint outlines GE's extensive pollution of Allendale Elementary School (where minor-plaintiff C.L. attended for years). Appx499-508 ¶¶ 184–203. Testing of the soil as recently as 2007 revealed "unacceptable" levels of PCBs in the soil at this school. Appx501-502 ¶ 187. To this day, ambient air testing has revealed there are detectable levels of PCBs in the air on the Allendale School property. Appx506 ¶ 190. Indeed, the levels of detectable PCBs in air sampling at Allendale School were *higher* in 2021 than they were in 2020. *Id.* As recently as October 2018, multiple wells tested near Hill 78 and near Allendale School "tested above benchmarks" for contamination. Appx507 ¶ 191.

Plaintiff's complaint outlines the misinformation campaign that GE has engaged in by lying to the public about the dangers of PCBs and the extent of PCB contamination in Pittsfield. Appx508-517 ¶¶ 204–236. For example, the complaint quotes former Pittsfield mayor, Remo DelGallo, who reported that he could "go back 50, 60 years if need be that when the General Electric Company had the oil tanks, the oil house up on the northerly side of the railroad tracks next to Peck's Bridge, those tanks leaked for years and years and years and I don't know why they never took corrective measures and the oil flowed down the embankment, under the

railroad tracks and then into East Street and what was said created a plume and when they say a plume, they're talking about an underground lake of oil." Appx514 ¶ 228.

Contrary to what GE states, the 2000 Consent Decree with the EPA did *not* require GE to dispose of PCBs at Hill 78. The Consent Decree merely reflected the EPA's agreement to allow GE to continue use Hill 78 as a dumping area for PCBs. Of course, GE had already been doing that for over half a century by the time the Consent Decree was entered. *See* Appx110-111 ¶ 15(a) (stating that materials GE was going to excavate per the consent decree "**may be**" consolidated at Hill 78) (emphasis added). Obviously, the EPA's statement that GE *may* do something is a far cry from requiring—or even suggesting—that GE do something. It is no accident that GE continually fails to acknowledge this language ("may be") and wrongly acts as if GE's dumping of PCBs at Hill 78 was somehow required by the government.

Paragraph 15(a)(i) of the Consent Decree—which GE does cite—merely states that *if* GE *chose* to consolidate waste materials at Hill 78, as the EPA stated they "may" do, then those materials could not contain more than 50 parts per million ("ppm") of PCBs. Appx111 ¶ 15(a)(i). The Consent Decree merely allowed GE to continue to use Hill 78 as a dumping ground—if GE *chose* to do so—and required that, *if* GE chose to do so, it was limited in the concentration of PCBs that it was allowed to deposit at Hill 78. Ironically, the Consent Decree itself recognizes that Hill 78 was an area that GE "historically used" for dumping toxic materials. *See*

Appx69-70 (defining "Hill 78 Consolidation Area"). GE ignores this critical historical context and falsely acts as if the 2000 Consent Decree created the inception of Hill 78 as a PCB dumping ground.

As plaintiff's complaint alleges, defendant "Monsanto was the sole manufacturer of PCBs in the United States." Appx476 ¶ 61. It is undisputed, by Monsanto's own representations to other federal courts, that all PCBs, including Pyranol, were originally manufactured and sold by Monsanto to "other companies," such as GE, who then used them in "electrical components and other machinery." Appx1529 ¶ 6. The district court below, which is intimately familiar with the GE/PCB saga, has previously recognized that "Aroclor, Pyranol and certain other epoxies containing [PCBs]" were "all manufactured by Monsanto." *Sarocco v. General Elec. Co.*, 879 F. Supp. 156, 158 (D. Mass. 1995).

GE's entire argument rests upon the false premise that: (1) the federal government somehow mandated, supervised, or oversaw GE's decades-long improper disposal, pollution, and dumping of PCBs throughout Pittsfield and at Hill 78; and (2) the 2000 Consent Decree required GE to use Hill 78 as a dumping ground for PCBs. But neither of these things is true. The federal government never mandated, oversaw, or supervised GE's negligent and improper disposal, pollution, and dumping of PCBs. And the 2000 Consent Decree did not and does not require GE to use Hill 78 as a dumping ground for any waste materials, including PCBs.

## SUMMARY OF ARGUMENT

The district court correctly ruled that GE could not meet the first required element of the federal-officer removal statute: that GE was "acting under" a federal officer's authority. GE was not "acting under" the federal government's authority when GE negligently disposed, dumped, and discarded PCBs throughout the community. GE's jurisdictional argument under § 1442 is a recycled one that has been consistently rejected by federal courts across this country in similar toxic-tort pollution cases, including PCB cases. As in those cases, here, Plaintiff's claims against GE are premised upon GE's negligent disposal and dumping of PCBs. Plaintiff's claims have nothing to do with the general fact that GE used PCBs in their manufacturing process of certain machines (transformers) during World War II. If GE never disposed, dumped, and discarded PCBs throughout the community, minor-plaintiff, C.L., would never have contracted leukemia from PCB exposure. Plain and simple.

In conjunction, the district court decidedly concluded GE's secondary jurisdictional argument, which fruitlessly rests upon a Consent Decree that GE entered into with the Environmental Protection Agency (EPA) in 2000. The district court aptly concluded that "courts have held that analogous EPA-ordered remedial measures do not transform a private polluter into a de facto government agent for removal purposes." Add7. As relied upon by the district court, the U.S. Supreme

Court has long held that, for purposes of a jurisdictional analysis under 28 U.S.C. § 1442, a private actor's "compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.'" *Watson v. Philip Morris Co.*, 551 U.S. 142, 153 (2007). Notably, and as determined by the district court, the 2000 Consent Decree was entered into *after* GE's negligent pollution conduct. Neither the EPA, nor any branch of the federal government, ever endorsed, condoned, required, or even knew about GE's improper pollution conduct when the conduct was occurring. Therefore, as the district court ruled, the 2000 Consent Decree does not—and cannot—demonstrate that GE was "acting under" the authority of the federal government when GE engaged in negligent pollution conduct that occurred and concluded years prior to the formation of the EPA Consent Decree in 2000. Because GE's actions under the Consent Decree are to be considered action ordered by the President "solely for purposes of Section 113(j)," here, where there are purely state-law tort claims (and no CERCLA claims) asserted against GE arising out of GE's negligent disposal activities that predate the 2000 Consent Decree, this provision of the Consent Decree has no relevance.

Finally, the district court's remand order should still be affirmed because GE has no colorable federal defense. As outlined *supra*, GE's federal-contract defense is one reserved only in cases involving design defects in military equipment. This

case does not involve any design defects in military equipment, and this exact federal-contractor defense has previously been rejected before by federal courts in PCB pollution cases. Lastly, GE has no defense under the Toxic Substances Control Act (TSCA), since, as multiple courts have held, the TSCA does not preempt state-law tort claims related to PCB-exposure injuries.

## ARGUMENT

This Court should affirm the district court's decision and order granting plaintiff's motion to remand to state court because this Court lacks subject-matter jurisdiction. GE failed to meet its burden to invoke federal-officer subject-matter jurisdiction under 28 U.S.C. § 1442(a)(1). The origin of defendant GE's conduct in this case is GE's decades of improper disposal, placement, discarding, and dumping of PCBs throughout Pittsfield, including improper disposal and placement of PCBs at Hill 78 and Allendale Elementary School. The federal government never required, mandated, ordered, or supervised any of this improper disposal, placement, discarding, and dumping of PCBs.

The 2000 Consent Decree entered into between GE and the EPA does not confer jurisdiction under § 1442(a)(1) because: (1) the Consent Decree did not and does not require GE to dump or dispose of PCBs at Hill 78 (something GE had been doing without the federal government's awareness, approval, or involvement for over half a century prior to 2000); and (2) GE's compliance with the EPA's

remediation plan shows GE was "simply complying with the law" which U.S. Supreme Court precedent has held insufficient to invoke federal-officer jurisdiction.

As outlined *infra*, and contrary to GE's assertions, the federal government never required GE to manufacture, use, or sell PCBs. Nor can GE point to a single contract entered into between GE and any federal agency that required GE to manufacture, use, or sell PCBs.[2] But even if the federal government had required GE to use, manufacture, or sell PCBs, federal-officer jurisdiction under § 1442(a)(1) is not present here because this action is based upon GE's improper disposal, dumping, and pollution activities that long predate any federal involvement. Under these circumstances, precedent commands a remand to state court.

Courts have routinely and repeatedly rejected attempts—identical to GE's attempt here—to invoke federal-officer jurisdiction under § 1442 in toxic disposal cases. This includes courts' repeated remands to state courts in PCB cases, like this one, which involve "wartime needs" arguments regarding the production and use of

---

[2] To be sure, GE itself never manufactured PCBs. As Monsanto has represented to various courts for years, and as these courts have recognized, Monsanto was, at all times, the sole and exclusive manufacturer of PCBs in the United States. *See, e.g.*, *San Diego Unified Port Dist. v. Monsanto Co.*, 445 F. Supp. 3d 1098, 1101 (S.D. Cal. 2020) ("Monsanto was the sole manufacturer of PCBs in the U.S."); *City of Seattle v. Monsanto Co.*, 387 F. Supp. 3d 1141 (W.D. Wa. 2019) (noting that Monsanto was "the sole manufacturer of PCBs in the United States between 1935 and 1979"); *State of Washington v. Monsanto Co.*, 274 F. Supp. 3d 1125, 1127 (W.D. Wa. 2017 ("From 1935 to 1979, Monsanto was the sole manufacturer of PCBs in the United States.")

PCBs. This Court should reach the same conclusion these courts, including the district court below, have routinely and repeatedly reached, and remand this action to state court.

### A.   Legal Standard on Removal and Remand

Federal courts are "courts of limited jurisdiction." *Badgerow v. Walters*, 596 U.S. 1, 7 (2022). Subject-matter jurisdiction refers to a court's "power to hear a case." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 354 (2010). Without subject-matter jurisdiction, a federal court may not hear the case. *Id.* Only Congress may determine a lower federal court's subject-matter jurisdiction. *Kontrick v. Ryan*, 540 U.S. 443, 452 (2004) (citing U.S. Const., Art. III, § 1). Cases filed in state court may only be removed to federal district court if the district court has original jurisdiction to hear the case. 28 U.S.C. § 1441(c). Federal district courts must remand a case to state court if, at any time before final judgment, "it appears that the district court lacks subject matter jurisdiction." 28 U.S.C. § 1447(c).

### B.   The Federal-Officer Removal Statute

Under the "federal-officer" removal statute, which is contained at 28 U.S.C. § 1442(a)(1), the proponent of jurisdiction bears the burden under § 1442(a)(1) to establish three required elements: (1) that it was "acting under a federal officer's authority"; (2) that the charged conduct was carried out "for or relating to" the asserted official authority; and (3) that it will assert a colorable federal defense to

the suit. *Moore v. Electric Boat Corp.*, 25 F.4th 30, 34 (1st Cir. 2022). Where "only the liability of a private company purportedly acting at the direction of a federal officer is at issue," then the federal-officer removal statue is to be "read narrowly." *New Mexico v. Monsanto Co.*, 454 F. Supp. 3d 1132, 1139 (D.N.M. 2020) (citing *Watson v. Philip Morris Co.*, 551 U.S. 142, 147 (2007)).

The U.S. Supreme Court has described the first requirement under § 1442(a)(1)—"acting under" a federal officer or agency—as a relationship that involves a private actor whose specific conduct was done "subject to the instruction, direction, or guidance of" the federal government. *Watson*, 551 U.S. at 151–52. However, this "acting under" the federal officer "does *not* include simply *complying* with the law." *Id.* at 152 (emphasis in original). To this end, our Supreme Court has emphasized that a private actor's "compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.'" *Id.* at 153. This is so "even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored." *Id.*

### C. Courts Have Repeatedly Held That Federal-Officer Removal Is Improper in Toxic Pollution Cases Including PCB Exposure Cases

Federal courts have consistently remanded cases to state court where private companies have invoked the federal-officer removal statute in toxic pollution cases.

The U.S. Court of Appeals for the First Circuit recently recognized that an oil company's invocation of § 1442(a)(1) was improper even where the oil company had numerous contracts with the federal government in relation to production of oil (and the underlying lawsuit alleged damages related to the use and production of that oil). *Rhode Island v. Shell Oil Prods. Co.*, 35 F.4th 44, 53 n.6 (1st Cir. 2022). The oil company invoked § 1442, claiming that it had contracts with the federal government requiring production of gas and oil. The First Circuit recognized that the oil company had produced and sold oil and gas products, per federal contracts, that were damaging to the environment and then engaged in a misinformation campaign. *Id.* But because the federal contracts the oil company was a party to "mandate[d] none of those activities," the First Circuit held the case was "*un*removable under the federal-officer removal statute." *Id.* (emphasis in original).

Courts have repeatedly held there is no basis for federal-officer removal jurisdiction in toxic-tort, negligent disposal, and pollution cases involving dangerous chemicals. *See Rucker v. Monsanto Co.*, Case No. 23–CV–00868–SPM, 2023 WL 3494716, at *2 (S.D. Ill. May 17, 2023) (Monsanto's improper use, storage, and release of toxic chemicals used to make Agent Orange insufficient to invoke federal-officer jurisdiction because, even though the government provided specifications for production of the chemicals, the federal government did not direct Monsanto on how to store or dispose of the chemicals); *Bahrs v. Hughes Aircraft Co.*, 795 F. Supp. 965

(D. Ariz. 2010) (no federal-officer jurisdiction for General Dynamics in water contamination case because there was no evidence as to the "manner in which the contract was carried out" and although "the government officials were undoubtedly most interested in the production of war materials, the record before this Court does not demonstrate the government's necessary control over the method of waste disposal"); *Coffey v. Freeport-McMoRan Copper & Gold Inc.*, 623 F. Supp. 2d 1257 (W.D. Okla. 2009) (no federal-officer jurisdiction for company that provided zinc to the federal government under a contract because the defendant failed to show that "the contamination was done under the direction of a federal officer"); *New Jersey DEP v. Exxon Mobil Corp.*, 381 F. Supp. 2d 398 (D.N.J. 2005) (no federal-officer removal for company in negligent disposal case even where company produced the chemicals for World War II purposes because the government had nothing to do with the improper disposal of the hazardous chemicals); *Arness v. Boeing N. Am, Inc.*, 997 F. Supp. 1268 (C.D. Cal. 1998) (no federal-officer jurisdiction for company that federal government required to use a certain toxic chemical to flush rocket engines with because the claim was based on the negligent "disposal and storage" of the chemicals which "were not performed at the government's behest").

Indeed, courts have repeatedly rejected the same exact federal-officer removal arguments GE makes in this case in other PCB exposure cases. *See State of Washington v. Monsanto Co.*, 274 F. Supp. 3d 1125 (W.D. Wa. 2017), *aff'd*, 738 F.

App'x 554 (9th Cir. 2018) (no federal-officer jurisdiction in PCB case); *New Mexico v. Monsanto Co.*, 454 F. Supp. 3d 1132 (D.N.M. 2020) (no federal-officer removal in PCB case); *Kelly v. Monsanto Co.*, 2016 WL 3543050, at *9 (E.D. Mo. June 29, 2016) (finding no federal-officer jurisdiction in PCB cancer case against private company based on company's "military needs" argument because defendants could not satisfy "acting under" element); *Mobley v. Cerro Flow Prods.*, Civil No. 09-697-GPM, 2010 WL 55906 (S.D. Ill. Jan. 5, 2010) (no federal-officer jurisdiction in PCB case against plant, even where they had a contract with the federal government, federal officers oversaw the plant, and they produced the chemicals for war, because there was no evidence "the government regulated disposal of toxic waste at the plants"); *Clayton v. Cerro Flow Prods., Inc.*, Civil No. 09-550-GPM, 2010 WL 55675 (S.D. Ill. Jan. 4, 2010) (no federal-officer jurisdiction in toxic PCB exposure case where plant was dumping chemicals); *Anderson v. Hackett*, 646 F. Supp. 2d 1041, 1054 (S.D. Ill. 2009) (no federal-officer removal in toxic PCB exposure case because there was no evidence the government directed the defendant on how to handle the PCBs or to produce PCBs); *Custer v. Cerro Flow Prods., Inc.*, No. 09–514–DRH, 2009 WL 5033931, at *7 (S.D. Ill. Dec. 15, 2009) (finding no federal-officer removal jurisdiction based on "wartime production" argument in PCB exposure case alleging injuries from company's disposal of PCBs in landfill because defendants offered "no evidence suggesting that the federal government directed

Defendants on how to dispose of PCBs produced by the Defendants during the 1970s").

Even where the EPA mandates certain conduct by private companies in remediation plans related to pollution, such compliance with EPA mandates is insufficient to obtain federal-officer jurisdiction. *See W. Va. State Univ. Bd. of Gov. v. Dow Chemical Co.*, 23 F.4th 288 (4th Cir. 2022) (holding that a private company's corrective actions taken pursuant to EPA orders is not sufficient to confer federal-officer removal because this merely shows minimal compliance with federal law). This is true with specific regard to EPA remediation plans for PCB cleanups. *See, e.g.*, *City of Brunswick v. Honeywell Internat'l, Inc.*, CV 222-132, 2023 WL 5671290 (S.D. Ga. Sept. 1, 2023) (compliance with EPA remediation plan for PCBs was not sufficient to invoke federal-officer jurisdiction and removal). These decisions are consistent with the Supreme Court's pronouncement that the "acting under" element of § 1442(a)(1) "does *not* include simply *complying* with the law." *Watson*, 551 U.S. at 152 (emphasis in original).

**D.    GE Has Failed to Establish Subject-Matter Jurisdiction Under the Federal-Officer Removal Statute**

GE regurgitates the same playbook that courts have routinely rejected, as seen by the district court below, as well as in the *State of Washington*, *State of New Mexico*, *Kelly*, *Mobley*, *Clayton*, *Anderson*, and *Custer* cases. In each of these cases, Monsanto and/or other corporate defendants invoked "wartime need" arguments in

lawsuits alleging injuries or damage due to the defendants' improper disposal, storage, and dumping of PCBs. Each time, these courts have held that subject-matter jurisdiction is not present under 28 U.S.C. § 1442(a)(1). In so doing, the courts have reasoned that, regardless of whether the federal government had contracts with the defendants for use or production of PCBs, the federal government had nothing to do with these companies' decisions to improperly dispose of, dump, and discard the PCBs. As such, the federal government cannot be said to have required, endorsed, or participated in the underlying conduct that caused the plaintiffs' harm.

This case is no different than *State of Washington*, *State of New Mexico*, *Kelly*, *Mobley*, *Clayton*, *Anderson*, and *Custer*. Here, minor-plaintiff, C.L., would never have developed leukemia if it were not for GE's negligent, reckless, and improper disposal of PCB waste materials in and around the GE plant. In other words, if GE had simply used PCBs but then properly disposed of the chemicals after their use, there would be no exposure to C.L. and, thus, there would be no legal cause of action. Like in *State of Washington*, *State of New Mexico*, *Kelly*, *Mobley*, *Clayton*, *Anderson*, and *Custer*, here there is no evidence the federal government required, endorsed, or participated in GE's underlying conduct that caused C.L.'s leukemia: the improper disposal and dumping of PCBs.

GE is correct that plaintiff relies on GE's dumping and disposal of PCBs at Hill 78 and at Allendale Elementary School (C.L.'s school) as a basis for C.L.'s

exposure and a cause of his cancer. But GE's improper disposal of PCBs at Hill 78 or Allendale Elementary School was never required, mandated, or endorsed by the federal government. As outlined *supra*, GE improperly provided PCB-drenched dirt to Allendale School in 1950. This event was in no way, shape, or form mandated, required, overseen, supervised, or even known about by the federal government.

Likewise, as outlined *supra*, GE improperly and negligently used Hill 78 as a dumping ground from the 1930s through 2000. This conduct—dumping PCBs in Hill 78—was in no way, shape, or form mandated, required, overseen, supervised, or even known about by the federal government. If GE had never engaged in this conduct, then C.L. would never have been exposed to PCBs in the first place. And none of this conduct was required, mandated, or ordered by the federal government.

GE cannot rely on the EPA's 2000 Consent Decree as a basis for federal-officer jurisdiction when GE had engaged in nearly a century of improper disposal of PCBs in Hill 78, Allendale School, and Pittsfield long before the federal government ever became involved. Just as with the oil company's improper disposal of gas and campaign of misinformation in *Shell Oil*, here, with respect to GE's improper disposal of PCBs, the federal contracts cited by GE "mandate[d] none of those activities" by GE, thus making this case "*un*removable under the federal-officer removal statute." 35 F.4th at 53 n.6.

As a matter of law, the 2000 Consent Decree cannot provide the basis for federal-officer jurisdiction because GE's compliance with the remediation measures outlined in the Consent Decree shows only that GE was "simply complying with the law." U.S. Supreme Court precedent has made clear that minimal compliance with federal law, including EPA remediation orders, is not enough to confer jurisdiction under § 1442(a)(1). *See Watson*, 551 U.S. at 152 (holding that that the "acting under" element of § 1442(a)(1) "does *not* include simply *complying* with the law") (emphasis in original); *Dow Chemical*, 23 F.4th 288 (private company's corrective actions taken pursuant to EPA orders insufficient to confer federal-officer jurisdiction because this merely shows minimal compliance with federal law); *City of Brunswick*, 2023 WL 5671290 (compliance with EPA remediation plan for PCBs insufficient to invoke federal-officer jurisdiction and removal).

The Consent Decree never required GE to store anything at Hill 78. Rather, the Consent Decree merely *allowed* GE to continue to store certain PCB-containing materials in Hill 78 which, of course, GE had already been doing for over half a century. *See* Appx110-111 ¶ 15(a) (stating that materials GE was going to excavate per the consent decree "**may be**" consolidated at Hill 78) (emphasis added).[3] Paragraph 15(a)(i) of the Consent Decree merely states that *if* GE *chose* to

---

[3] Obviously the federal government's statement that GE *may* do something is a far cry from requiring—or even suggesting—that GE do something.

consolidate certain materials at Hill 78—as the EPA stated they "may" do—then those materials could not contain more than 50 parts per million ("ppm") PCBs. Appx111 ¶ 15(a)(i). Since the Consent Decree states only that GE "may" continue to use Hill 78 for certain PCB material, GE could have decided, as of 2000, to not dump *any* PCBs at Hill 78 and remained in compliance with the Consent Decree. Instead, GE decided to continue to dump PCBs at Hill 78 after the Consent Decree was entered even though GE was not required to do so by the federal government.

Documents GE has submitted in support of its Notice of Removal confirm that Monsanto—not GE—was the "sole supplier of Pyranol," which GE then used and negligently disposed of in Pittsfield. Appx550 at para. 1. Notably, Monsanto did not remove this case and has not sought to invoke subject-matter jurisdiction under 28 U.S.C. § 1442. Only GE has. Since Monsanto is not seeking the protection of § 1442(a)(1) in this case, only GE's contacts with the federal government may be considered.[4]

GE disingenuously cherry picks one phrase within the 409-page Consent Decree in arguing that GE's remediation under the Consent Decree "***constitute[d]***

---

[4] Monsanto has likely given up on attempting to invoke federal-officer jurisdiction since federal district courts have repeatedly rejected these attempts by Monsanto, including in PCB cases just like this case. *State of Washington*, 274 F. Supp. 3d 1125, *aff'd*, 738 F. App'x 554; *New Mexico*, 454 F. Supp. 3d 1132; *Kelly*, 2016 WL 3543050, at *9; *Mobley*, 2010 WL 55906; *Clayton*, 2010 WL 55675; *Anderson*, 646 F. Supp. 2d at 1054; *Custer*, 2009 WL 5033931, at *7.

*actions taken or ordered by the President*." *See* Appx59 (emphasis in original). This argument has no weight. The full sentence (omitted by GE) of this part of the Consent Decree reads: "**Solely for the purposes of Section 113(j) of CERCLA**, the response actions selected and the Work to be performed by [GE] shall constitute response actions taken or ordered by the President." *See* Appx59 ¶ R (emphasis added).

By way of background, the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*, was enacted by Congress in 1980. CERCLA is administered by the EPA and was enacted in order to investigate and manage "Superfund sites" that have been contaminated with hazardous substances. There are various causes of action that can be asserted, pursuant to CERCLA, against owners of superfund sites. *See* 42 U.S.C. §§ 9607, 9611–9613. Plaintiff has not asserted any claims under CERCLA.

Section 113(j) of CERCLA, which has been codified at 42 U.S.C. § 9613(j), states: "**In any judicial action under this chapter**, judicial review of any issues concerning the adequacy of any response action taken or ordered by the President shall be limited to the administrative record. Otherwise applicable principles of administrative law shall govern whether any supplemental materials may be considered by the court." 42 U.S.C. § 9613(j)(1) (emphasis added). Section 113(j) further outlines that there is an "arbitrary and capricious" standard of review applied

to any objections raised in judicial actions brought under CERCLA. *Id.* § 9613(j)(2). Section 113(j) merely codifies what standard of review courts and administrative tribunals should employ when adjudicating actions filed under CERCLA.

Therefore, when the 2000 Consent Decree stated that the remediation actions ordered within the Consent Decree should constitute action taken by the President "**[s]olely for the purposes of Section 113(j) of CERCLA**," this merely communicated that, in a CERCLA action filed against GE related to GE's performance under the Consent Decree, the EPA or court must employ the standards of review outlined in Section 113(j). *Id.* § 9613(j)(1) (limiting judicial review to "the administrative record"), § 9613(j)(2) (applying "arbitrary and capricious" standard of review). Because GE's actions under the Consent Decree are to be considered action ordered by the President "solely for purposes of Section 113(j)," here, where there are purely state-law tort claims (and no CERCLA claims) asserted against GE arising out of GE's negligent disposal activities that predate the 2000 Consent Decree, this provision of the Consent Decree has no relevance.

Much of the documents upon which GE relies reflect communications between Monsanto (who has not sought to invoke federal-officer jurisdiction in this case) and the federal government. However, courts have already held that these exact contacts between Monsanto and the federal government are not sufficient to invoke jurisdiction under § 1442(a)(1) in other toxics exposure cases involving PCBs. *See,*

*e.g.*, *State of Washington*, 274 F. Supp. 3d at 1128–29 (rejecting Monsanto's attempt at removal in PCB case under § 1442 premised upon the same evidence and wartime contacts that GE cites in this case as a basis for removal); *New Mexico ex rel. Balderas*, 454 F. Supp. 3d at 1139–42 (same); *Kelly*, 2016 WL 3543050, at *9 (same); *Mobley*, 2010 WL 55906 at *4–7 (same); *Clayton v. Cerro Flow Prods., Inc.*, Civil No. 09-550-GPM, 2010 WL 55675, at *3–7 (same); *Anderson v. Hackett*, 646 F. Supp. 2d at 1054 (same); *Custer*, 2009 WL 5033931, at *7 (same). GE is merely regurgitating losing arguments that federal courts have customarily rejected as bases for jurisdiction under 28 U.S.C. § 1442.

GE's brief is riddled with mischaracterizations of the documents that GE cites in support of removal. For example, GE cites to a 1941 letter it wrote to Monsanto asking Monsanto to increase its production of PCBs to assist GE in providing certain equipment "for use in defense work." Appx763. However, this letter fails to establish—as GE contends—that the federal government required GE to use Pyranol or PCBs in its electric transformers. In fact, the GE author of the letter concedes that GE's request for Pyranol was based upon *GE*'s own internal requirements—not any requirement of the federal government. *See id.* (noting that the use of Pyranol was "to meet the requirements of **ourselves** and Licensees") (emphasis added).

But even if GE produced evidence—which it has not—that the government required GE to use PCBs in manufacturing equipment that would not be sufficient

to invoke jurisdiction under § 1442(a)(1). GE's negligent disposal and dumping of PCBs throughout Pittsfield is a necessary ingredient of plaintiff's claims against GE. Again, if GE merely used PCBs in making equipment but then safely and properly disposed of the PCB waste after use, there would be no PCB exposure and thus there would be no claim.

GE continuously conflates PCBs with askarels. *See* Appx23 ¶ 18 (equating PCBs and askarels even though the exhibit cited does not do so). But PCBs and askarels are not necessarily the same thing, as GE contends. According to the Merriam-Webster Dictionary, an "askarel" is "a synthetic electrically insulating liquid that is noncombustible." *See* Definition of "Askarel," MERRIAM-WEBSTER DICTIONARY, available at https://www.merriam-webster.com/dictionary/askarel#:~:text=%3A%20a%20synthetic%20electrically%20insulating%20liquid%20that%20is%20noncombustible (last accessed Sept. 25, 2025); *cf.* Appx798 (discussing the procurement of "askarel liquids **such as**" PCBs) (emphasis added). Simply put, PCBs fall under the general umbrella term "askarel." However, not all askarels contain PCBs, as GE falsely contends.

GE cites a 1974 letter sent to GE from the Department of the Navy in which the Navy stated that the "use of askarel" oils was essential to the Navy. Appx798. Ironically, this letter was sent to GE in response to GE's request that the Navy sign an indemnification agreement to protect GE from liability based on GE's "anxiety

about the possibility of misuse of this fluid." *Id.* Nothing in this letter required GE to provide PCBs to the government. The letter merely reflected the Navy's view that askarels, in general, were essential for operation of some of its equipment. Regardless, this letter in 1974 follows over 40 years of PCB pollution, dumping, and improper disposal that GE had already engaged in throughout Pittsfield, including at Hill 78 and Allendale School.

In an even more remarkable show of incredulity, GE actually cited, in the district court below, one of its own internal documents that falsely claimed the use of PCBs was federally "***mandated***." *See* Appx24, Appx33 ¶¶ 20, 55 (emphasis in original). This 1971 memorandum cited by GE states that there were "various codes, standards, and regulations that now effectively require or encourage the continued use of askarel-insulated equipment in many applications." Appx805. However, this GE report fails to actually cite a single code, standard, or regulation that requires or encourages the continued use of askarel-insulated equipment. *Id.*

In an attempt to further its phony argument that use of askarels was "federally mandated," GE cited to the district court below the Federal Register. *See* Appx24 ¶ 20 (citing 72 Fed. Reg. 7,136 and 37 Fed. Reg. 3,431). But none of those portions of the Federal Register actually contain any "federal mandate" on use of askarels or PCBs. *Id.* In fact, the two portions of the Federal Register that GE cites *post*-date the 1971 memorandum that GE cites that proclaimed that there were "various codes,

standards, and regulations that now effectively require or encourage the continued use of askarel-insulated equipment in many applications."

Even if there were federal regulations or laws that required use of PCBs—which there were not—such minimal compliance with federal regulations or laws would be insufficient to invoke subject-matter jurisdiction under § 1442(a). This is because the U.S. Supreme Court has boldly pronounced: "A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the statutory phrase 'acting under' a federal 'official.'" *See, e.g.*, *Watson*, 551 U.S. at 152; *see also id.* (holding that that the "acting under" element of § 1442(a)(1) "does *not* include simply *complying* with the law") (emphasis in original).

GE cited to the district court below a document from Signal Corps Laboratories in Monmouth, New Jersey in which the procurement of a single Pyranol capacitor is discussed between this New Jersey company and the Army. *See* Appx28 ¶ 37. According to GE, this was a "GE Pyranol capacitor." *Id.* However, examination of the document cited reveals absolutely no mention of GE anywhere within the document. Appx861-863. Even if this document did reflect purchase of a single GE transformer, that does nothing to further GE's argument for jurisdiction since this case is about GE's improper disposal and dumping of PCBs throughout Pittsfield—not its sale of machines that contain PCBs. Nowhere does plaintiff's

complaint allege that the mere sale of electrical transformers caused plaintiff's exposure to PCBs.

GE cited below to a few purchase orders for Pyranol transformers. *See* Appx28 ¶ 39; (citing Appx864-874). The first document cited by GE does not even mention GE or Pittsfield. Appx864-865. The second document mentions GE but refers only to GE's Washington, D.C. and Schenectady, New York locations—not GE's Pittsfield, Massachusetts plant.[5] Appx866-869. The third document generally mentions "GE" yet fails to reveal from which GE location or from where in the United States this GE equipment was being purchased and sent. Appx870-874.

GE also cited to a 1940s ledger from the federal government which reflects that GE, like many companies during World War II, was providing certain products to the government, such as gun directors and capacitors. *See* Appx28 (citing Appx875-876). An examination of this ledger reveals absolutely no mention of PCBs and no mention of the Pittsfield plant. Appx875-876. The ledger does not reflect any governmental requirement, mandate, or suggestion to GE regarding use or disposal of PCBs. The mere fact that GE provided certain equipment to the government does nothing to establish that GE was "acting under" the federal

---

[5] While GE fails to mention this, GE used PCBs and Pyranol in various locations and facilities throughout the United States—not just at its Pittsfield, Massachusetts plant.

government when GE improperly disposed of, discarded, and dumped thousands of pounds of PCB waste throughout Pittsfield and into the Housatonic River.

GE points to the fact that it had contracts with the government in the 1940s to produce certain equipment. *See* Appx29 ¶ 41 (citing Appx877-880). However, these contracts do not mention PCBs. Appx877-880. These contracts do not require the use of PCBs. *Id.* The U.S. Court of Appeals for the First Circuit and other courts have soundly rejected this sort of "governmental contract" argument in other toxic-chemical exposure cases. *See Shell Oil*, 35 F.4th at 53 n.6 (rejecting oil company's attempt at removal under § 1442(a)(1) even where the company established it had multiple contracts to produce the product in question because these contracts "mandate[d] none" of [the company's] activities" in negligently damaging the environment with the product and subsequently "engag[ing] in a misinformation campaign about the harmful effects of their products").

Just like the company's contracts in *Shell Oil*, nothing about the contracts cited by GE mandated, approved, or endorsed GE's decades-long pollution, dumping, and improper disposal of PCBs throughout Pittsfield, including at Hill 78 and Allendale Elementary School. Nor did any of these contracts mandate, approve, or endorse the misinformation campaign that GE has peddled to the people of Pittsfield regarding the true dangers of PCBs and the severity and extent of GE's pollution of Berkshire County. *See* Appx508-517 ¶¶ 204–236 (specifically outlining this misinformation

campaign which has gone on for decades and continues to occur to this day); *see also Bahrs*, 795 F. Supp. at 970 (rejecting General Dynamics' removal attempt under § 1442(a)(1) based on World War II contracts in toxic contamination case and holding that although "the government officials were undoubtedly most interested in the production of war materials, the record before this Court does not demonstrate the government's necessary control over the method of waste disposal"); *Coffey*, 623 F. Supp. 2d at 1275 (no federal-officer removal for company that provided zinc to the federal government under a contract because the defendant failed to show that "the contamination was done under the direction of a federal officer"); *New Jersey DEP*, 381 F. Supp. 2d at 404–05 (no federal-officer removal for company in negligent disposal case even where company produced the chemicals for World War II purposes because the government had nothing to do with the improper disposal of the hazardous chemicals); *Arness*, 997 F. Supp. 1274–75 (no federal-officer removal for company that federal government required to use a certain toxic chemical to flush rocket engines with because the claim was based on the negligent "disposal and storage" of the chemicals which "were not performed at the government's behest").

GE's argument suffers from the same fatal flaw throughout: it relies on the mere fact that GE provided certain machines to the federal government that contained PCBs. Because GE used oils that contained PCBs in manufacturing these machines, GE's argument goes, therefore this Court has subject-matter jurisdiction

under § 1442(a)(1). Unfortunately for GE, such an attenuated argument does not support a basis for jurisdiction under § 1442(a)(1) as made clear in *Shell Oil*, *Bahrs*, *Coffey*, *New Jersey DEP*, and *Arness*. GE has failed to produce a single piece of evidence indicating that the federal government mandated, required, supervised, or endorsed GE's horrific pollution, disposal, and dumping of PCB waste—the conduct that forms the basis of plaintiff's complaint. GE was not "acting under" the federal government when it improperly disposed of, dumped, polluted, and discarded PCB waste throughout Pittsfield from the early 1900s through the twenty-first century. If GE's version of the law were the actual standard that is imposed by § 1442(a)(1), then every company in the history of the United States who improperly disposed of toxic chemicals that the government used at some point in time could avail themselves of federal jurisdiction. That was obviously not the intent of Congress in enacting § 1442(a)(1) and has not been the way in which courts have applied § 1442(a) to toxic contamination cases.

For the same reasons that GE has failed to demonstrate it was "acting under" the direction of the federal government for purposes of § 1442(a), GE has failed to demonstrate that GE's "charged conduct" in this case—the negligent disposal and dumping of PCBs throughout Pittsfield—was "for or relating to" any "asserted

official authority" of the federal government. *Moore*, 25 F.4th at 34.[6] For starters, no federal official authority ever asserted or proclaimed that GE should improperly dispose of and dump toxic chemicals, including PCBs, throughout Pittsfield for 70 years. There simply is no nexus—try as GE may to cobble one together—between this "charged conduct" and the federal government.

GE relies on *Moore v. Electric Boat Corp.*, 25 F.4th 30 (1st Cir. 2022) throughout. However, *Moore* is entirely unlike this case. *Moore* was an asbestos case filed by an injured worker against Electric Boat Corporation ("Electric Boat"). "Electric Boat built the USS Francis Scott Key [ship] for the Navy at its shipyard in Groton, Connecticut." 25 F.4th at 32. Since the ship was built on Navy property, the shipyard operated "in accordance with government contracts, in conformance with military specifications, and under Navy oversight." *Id.* at 33. The Navy actually "supervised Electric Boat's operations, had designated officials present at the Electric Boat shipyard to oversee Electric Boat's employees, and maintained a substantial presence at the shipyard, including offices, sleeping quarters, training centers, and other facilities." *Id.* As the Court pointed out: "The Navy oversaw every aspect of the design, construction, maintenance, and modernization of its submarines like the USS Francis Scott Key." *Id.*

---

[6] Again, having concluded GE failed to meet the first element, the district court below never reached this second element of the jurisdictional analysis.

Against this backdrop, not surprisingly, the First Circuit in *Moore* held that there was subject-matter jurisdiction under the federal-officer removal statute. Unlike plaintiff in this case, the plaintiff in *Moore* did "not dispute that [defendant] . . . was 'acting under' a federal officer's authority." *Id.* at 34.[7] The Court's finding that Electric Boat's charged conduct was for or relating to authority asserted by the federal government was based upon numerous factors—none of which are present here.

Unlike the property in *Moore*, which was owned by the federal government, all of GE's charged conduct in this case occurred on GE's private property. Also unlike *Moore*, there is no evidence here that the federal government "supervised [GE]'s operations, had designated officials present at the [GE plant in Pittsfield] to oversee [GE]'s employees, and maintained a substantial presence at the [GE plant in Pittsfield], including offices, sleeping quarters, training centers, and other facilities." *Cf. id.* at 33. Nor is there any evidence in this case, as there was in *Moore*, that the federal government "oversaw every aspect of the design, construction, maintenance, and modernization of [GE's products that contained PCBs]." *Cf. id.*

Finally, *Moore* did not involve a toxic contamination/negligent disposal case. *Moore* was an asbestos case. Therefore, it was the mere existence of asbestos on the

---

[7] Here, by contrast, plaintiff vigorously disputes—and GE has failed to show—that GE was "acting under" the federal government in disposing, dumping, and discarding PCBs throughout Pittsfield, for all the reasons outlined *supra*.

federal government property (within a Navy ship) that injured a worker who was exposed to the asbestos while working in this ship on federal property. Here, much differently, minor-plaintiff, C.L., became exposed to PCBs only through GE's affirmative and intentional conduct in disposing and dumping PCBs at Hill 78, Allendale School, and throughout Pittsfield. None of this charged conduct by GE occurred on federal property or under the direction, supervision, or control of the federal government.

Rather than deal with the body of on-point decisions holding that there is no federal-officer jurisdiction in PCB exposure cases, GE instead cites to a string of inapposite cases that, when closely examined, do not help GE. For example, GE cites to *Maryland v. 3M Company*, 130 F.4th 380 (4th Cir. 2025). For starters, *Maryland* is inapplicable here because *Maryland* solely examined the second element under 28 U.S.C. § 1442: that the charged conduct be "for or in relation to asserted federal authority." 130 F.4th at 384. Here, the district court found that GE had failed to meet the first element ("acting under") and thus never reached this second element.

Nevertheless, *Maryland* is readily distinguishable. In *Maryland*, the plaintiffs' complaint intentionally and explicitly distinguished between chemical products the defendant produced for the military versus chemical products not produced for the military. *Id.* at 385. For this reason, the Court found that the factfinder in the underlying case would necessarily be tasked with "deciding whether certain PFAS

contamination came from [defendant]'s Military [product] or from its non-[military] products." *Id.* at 391. Because of this distinction pled by the plaintiffs, the Court deemed that the defendant's conduct "relates to its federal work" based on the way the plaintiffs pled the cause of action. Importantly, here, plaintiffs make no distinction in their claims between PCBs that GE disposed of that were manufactured for the government versus non-government PCBs that were dumped throughout the community. Therefore, no factfinder will ever be tasked in  case with making such a distinction.

To reiterate, courts have routinely refused to find federal-officer jurisdiction in cases such as this one (where only state-law tort claims are filed against a defendant who was subject to remediation orders). *See Dow Chemical*, 23 F.4th 288 (private company's corrective actions taken pursuant to EPA orders not sufficient to confer federal-officer removal because this merely shows minimal compliance with federal laws). This is true with specific regard to PCB cases. *See, e.g.*, *City of Brunswick*, 2023 WL 5671290 (compliance with EPA remediation plan for PCBs insufficient to invoke federal-officer jurisdiction). These decisions are consistent with the Supreme Court's pronouncement that the "acting under" element of § 1442(a)(1) "does *not* include simply *complying* with the law." *Watson*, 551 U.S. at 152 (emphasis in original).

E.     **The Complaint's Reference to "Remediation" Does Not Confer Jurisdiction Under 28 U.S.C. § 1442**

The inclusion of the words "remediate" and "remediation" in plaintiff's complaint does not confer or support federal-officer jurisdiction. Nor does the complaint's reference to the EPA consent decree, which is merely a minimum federal standard that GE is required to follow.

In *West Virginia State University Board of Governors v. Dow Chemical Co.*, 23 F.4th 288 (4th Cir. 2022), a university filed a complaint in state court bringing state-law claims against a chemical company for carcinogenic groundwater contamination. The plaintiff explicitly alleged throughout the complaint that the defendant had failed to properly "remediate" the site. Appx1563-1566, 1576 ¶¶ 31, 35(a), 35(d), 35(e), 35(f), 42, 43, 105. Just like in this case with GE, in *West Virginia*, the EPA had previously issued a corrective action order mandating the chemical company remediate the site in accordance with EPA specifications. *See West Virginia*, 23 F.4th at 293.

Identical to GE's tactic here, the chemical company-defendant in *West Virginia* filed a notice of removal, arguing that there was federal jurisdiction under the federal-officer statute, 28 U.S.C. § 1442, because the plaintiff's complaint challenged "remediation" that was covered and subsumed by a pre-existing EPA order. *See id.* at 297 (referencing defendant's argument that there is jurisdiction under § 1442 because the plaintiff's "claims expressly challenge the adequacy of Defendants' remediation efforts . . . and so relate to Defendants' performance of the

EPA-directed cleanup"). The plaintiff filed a motion to remand, which the district court granted, ruling the Court did not have jurisdiction. *Id.* at 296.

On appeal, the U.S. Court of Appeal for the Fourth Circuit affirmed the district court's remand of the case to state court. In so doing, the Court firmly rejected the defendant's "remediation" argument, emphasizing that the defendant's compliance with the EPA order merely "represents its adherence to minimum remedial measures" which are insufficient to confer federal jurisdiction. *Id.* at 304. As the Court aptly reasoned: "Ultimately, we find Defendants' arguments unpersuasive because they would impermissibly expand the federal removal statute by blurring the line in Watson carefully delineated where 'a private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.'" *Id.* (quoting *Watson v. Philip Morris Co.*, 551 U.S. 142, 153 (2007)). This was so even though the Court acknowledged that the defendant had "complied with the EPA's remedial measures." *Id.* at 305.[8]

In *City of Brunswick v. Honeywell International, Inc.*, 22-cv-00132, 2023 WL 5671290 (S.D. Ga. Sept. 1, 2023), the plaintiff filed state-law claims against a chemical company in state court for polluting its city with polychlorinated biphenyls

---

[8] Notably, the *West Virginia* decision was rendered in 2022, over a decade after the Removal Clarification Act of 2011—a law that GE argues loosened the standard for obtaining federal-officer jurisdiction.

("PCBs"). Just like here, the plaintiff's complaint in *City of Brunswick* explicitly alleged that the defendant failed to properly "remediate" the site the company had polluted with PCBs. Appx1591-1593, 1596 ¶¶ 57–58, 60, 67, 69, 96. In fact, the plaintiff's complaint specifically referenced CERCLA (the law that GE argues supports federal jurisdiction here). Appx1596-1597 ¶¶ 96–98. Just like in this case, the defendant in *City of Brunswick* was subject to an EPA consent decree that had previously been entered and which mandated certain remediation measures be taken by the defendant. Appx1626-1699.

Identical to GE's tactic here, the defendant in *City of Brunswick* filed a notice of removal arguing that there was federal jurisdiction under the federal-officer statute, 28 U.S.C. § 1442, because the plaintiff's "claims are connected or associated with Defendants' decades-long investigation and remediation of environmental contamination . . . under the direction and oversight of the [EPA]." *City of Brunswick*, 2023 WL 5671290, at *2. Just like GE, the defendant in *City of Brunswick* also argued that CERCLA supported federal jurisdiction. *Id.* at *3. The plaintiff filed a motion to remand, which the district court granted, sending the case back to state court.

Just as plaintiff has argued before this Court, in *City of Brunswick*, the plaintiff pointed out that "Defendants released pollutants even before EPA was involved, and the Complaint does not allege the pollution was done under the direction and control

of the EPA." *Id.* The district court in *City of Brunswick* found that "Defendants have not identified how the Consent Decree, federal regulations, or federal officers required them to cause the pollution." *Id.* The same rationale applies here. Just like the defendant's PCB pollution in *City of Brunswick*, GE's PCB pollution of Pittsfield began long before the EPA first became involved in 2000. In the same vein, GE has never identified—because it cannot—how the Pittsfield consent decree required or ordered GE to pollute the City of Pittsfield with PCBs, as GE in fact did for decades preceding any federal or EPA involvement.[9]

Just like this case, *West Virginia* and *City of Brunswick* involved lawsuits brought in state court against chemical companies who had previously been ordered by the EPA to remediate polluted sites. The plaintiffs' complaints in these cases expressly criticized the defendants' "remediation" efforts. Nevertheless, in both cases, the courts correctly concluded that there was no federal-officer jurisdiction because the defendants had failed to satisfy the first prong of its burden: that the defendant was "acting under" a federal officer's authority.

The same is true here. GE has failed to satisfy its burden of demonstrating that GE was acting under a federal officer's authority when it polluted Pittsfield with PCBs for decades before any federal or EPA involvement. And, as *West Virginia* and

---

[9] Just like the Fourth Circuit's *West Virginia* decision, the *City of Brunswick* decision came out well over a decade after Congress passed the Removal Clarification Act of 2011.

*City of Brunswick* make clear, the EPA's consent decree that it entered in 2000 does not magically transform this case into one where there is federal jurisdiction. The resounding rejection of this argument by the courts in *West Virginia* and *City of Brunswick* was firmly rooted in the U.S. Supreme Court's well-established pronouncement that:

> A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase "acting under" a federal "official." And that is so even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored.

*See West Virginia*, 23 F.4th at 301 (quoting *Watson*, 551 U.S. at 153); *see also City of Brunswick*, 2023 WL 5671290, at *3 (citing *Watson* for the proposition that "the EPA supervising Defendants' activities is not sufficient to demonstrate they acted under a federal officer"). This Court should apply the same reasoning as did the courts in *West Virginia* and *City of Brunswick*.

**F. GE Has No Colorable Federal Defense**

As explained above, GE has failed to establish that it was "acting under" a federal officer's authority when it engaged in the conduct (*i.e.* negligent dumping and disposal of chemicals) that forms the basis of plaintiff's complaint. For this reason alone, and as held by the district court, GE has failed to establish jurisdiction under § 1442(a). *See Moore*, 25 F.4th at 34 (emphasizing that the "acting under" element is essential to establish jurisdiction under § 1442(a)). GE has also failed to

establish that its charged conduct was for or relating to an asserted official authority. GE's failure to establish this required element means that there is no federal-officer jurisdiction. *See id.* (stating that the party invoking § 1442(a) must prove its charged conduct was carried out for or relating to asserted official authority in order to establish jurisdiction). Because GE has failed to establish either of the first two requirements under § 1442(a), this Court need not reach the question of whether GE has asserted a "colorable federal offense." *Id.*

If the Court were to reach this question regarding a colorable federal defense, this Court should easily conclude that GE has not asserted a colorable federal defense. The federal-contract defense GE attempts to invoke is available only in cases involving "design defects in military equipment." *Boyle v. United Tech. Corp.*, 487 U.S. 500, 512 (1988). In such cases, the party invoking the defense must show that "the design feature in question was considered by a Government officer, and not merely by the contractor itself." *Id.* This case does not involve any "design defects in military equipment." While plaintiff has asserted that PCBs are defectively designed and unreasonably dangerous, PCBs are not "military equipment." Even if PCBs constituted "military equipment," which they do not, GE has failed to set forth any evidence that the design of PCBs "was considered by a Government officer" as opposed to only GE.

Federal courts have held that the extent of the federal government's involvement in the manufacture and use of PCBs was insufficient to support a colorable federal-contractor defense. *E.g.*, *New Mexico ex rel. Balderas*, 454 F. Supp. 3d at 1145 (finding that the government's relationship with the manufacture, production and use of PCBs "did not involve detailed regulation, monitoring or supervision of the kind that characterizes the government contractor relationship"); *Custer*, 2009 WL 5033931, at *4 (finding defendants in PCB negligent-disposal case failed to raise a "colorable" federal-contractor defense because the defendants "have not pointed to any government requirement that prevented them from handling and disposing of the PCBs with care"). Finally, GE has not produced any evidence that GE warned the federal government about the dangers in using PCBs.

GE also has no "colorable" federal preemption defense under the Toxic Substances Control Act (TSCA). In *Stewart v. Rheem Manufacturing Co.*, the Court of Appeal of Louisiana held that the TSCA's preemption clause, 15 U.S.C. § 2617, did not preempt state-law tort claims brought against a company for injuries related to PCB exposure due to a leaking air conditioning unit. 926 So. 2d 90, 93–94 (La. Ct. App. 2006). After engaging in a thorough statutory analysis, the Court emphasized that, although "the EPA regulates the permissible risk of exposure to PCBs," it does not regulate "the specific manner in which that risk is minimized." *Stewart*, 926 So. 2d at 93. The Court further noted: "There are no requirements, such

as design or use of particular materials, provided in the regulations." *Id.* The TSCA's "lack of such language," the Court reasoned, "indicates that the [TSCA] does not seek to regulate these considerations, leaving that task to the states." *Id.* at 93–94.

In *Chappell v. SCA Services, Inc.*, a federal district court reached the same conclusion. 540 F. Supp. 1087, 1096–1100 (C.D. Ill. 1982). There, the plaintiffs filed state-law tort claims in state court for damages "resulting from the creation, maintenance and operation of a hazardous-chemical-waste landfill containing polychlorinated biphenyls (PCB's)." *Chappell*, 540 F. Supp. at 1089. The defendant made the same argument GE makes here: the state-law tort claims are preempted by Section 2617 of the TSCA. *Id.* at 1096–97. The district court rejected this argument and, pointing to the specific statutory language of the TSCA, explained that "state laws relating to disposal of chemical substances are not preempted by the TSCA." *Id.* at 1098. The district court also cited to EPA's own position "that TSCA does not preempt local disposal requirements." *Id.*

The district court in *Chappell* also relied upon Section 2619 of the TSCA, which is entitled "Citizens' civil actions." *See* 15 U.S.C. § 2619. As this provision of the TSCA makes clear: "Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute **or common law** to seek enforcement of this chapter or any rule or order under this chapter **or to seek any other relief**." *Id.* § 2619(c)(3) (emphasis added). By enactment of this provision,

Congress has made explicitly clear that the TSCA shall not preempt individuals' "common law" claims under state law. *Id.*

GE lastly tries to argue that it has a "colorable" federal defense based on CERCLA preemption. GE is wrong. GE cites to a few cases in which the plaintiffs' claims were based upon allegations that the defendants were liable for failing to depart from the terms of a consent decree in how the defendants remediated a site. Unlike the claims in those cases, plaintiff's claims here are premised upon GE's negligent pollution and contamination of Pittsfield with PCBs for decades before any consent decree or remediation plan was in place. Plaintiff here does not allege that GE is liable for failing to depart from the 2000 Consent Decree.

Because GE is unable to establish the first two elements required to obtain removal under 28 U.S.C. § 1442, this Court need not even reach the question of whether GE has presented a colorable federal defense. Nevertheless, in the event the Court does reach this question, it should answer it in the negative for all the reasons outlined *supra*.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's remand order.

CRYSTAL CZERNO, Ind'lly and p/p/a C.L.,
a minor, Plaintiff-Appellee

By /s/ John B. Stewart
JOHN B. STEWART (CA1 Bar #8817)
JOHN B. STEWART, P.C.
93 Van Deene Ave., Ste. 103
West Springfield, MA 01089
Ph. (413) 206-9134
E-mail: thetrialer@aim.com

By /s/ Thomas E. Bosworth
THOMAS E. BOSWORTH
BOSWORTH DEANGELO, LLC
123 S. Broad St., Ste. 1620
Philadelphia, PA 19109
Ph. (267) 928-4183
E-mail: tom@bosworthdeangelo.com

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains a total of 12,407, excluding the parts of the brief exempted by Rule 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office, in Times New Roman, proportional 14-point type, including serifs.

September 26, 2025                    /s/ John B. Stewart
                                      JOHN B. STEWART

# CERTIFICATE OF SERVICE

Appeal No. 25-1314

 I, John B. Stewart, hereby certify that on September 26, 2025,  I served copies of BRIEF OF THE DEFENDANT-APPELLEE, CRYSTAL CERNO Ind'lly and p/p/a C.L., a minor, on the following parties through the ECF system:

<u>Counsel for General Electric Company</u>
William M. Jay
Andrew Kim
Goodwin Procter LLP
1900 N Street, NW
Washington, DC 20036

Christopher J.C. Herbert
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210

James M. Campbell
Michelle M. Byers
Christopher Parkerson
Campbell Conroy & O'Neil, P.C.
20 City Square, Ste. 300
Boston, MA 02129

Dated: September 26, 2025  /s/ John B. Stewart
           JOHN B. STEWART